IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| STEVEN M. JACOB, | |
| Plaintiff, | **4:25CV3093** |
| vs. | |
| PATRICK CONDON, County Attorney for Lancaster County, Nebraska; | **MEMORANDUM AND ORDER** |
| Defendant. | |

This matter is before the Court on Plaintiff Steven M. Jacob's Complaint, Filing No. 1, Motion for Leave to Amend, Filing No. 10, and Motion for Status, Filing No. 11. With this Memorandum and Order, the Motion to Amend[1] and the Motion for Status are granted. Jacob has been given leave to proceed in forma pauperis. Filing No. 9. The Court now conducts an initial review of Plaintiff's Complaint to determine whether summary dismissal is appropriate under 28 U.S.C. § 1915(e)(2) and 1915A. For purposes of this initial review, the Court will consider Jacob's Amendment, Filing No. 10 at 2, as supplemental to the Complaint.

## I.  SUMMARY OF COMPLAINT

Jacob is currently incarcerated at the Nebraska State Penitentiary. Filing No. 1 at 1. After two trials, Jacob was convicted of one count of first-degree murder in the death of Melody Hopper, one count of second-degree murder in the death of James Etherton, and two counts of using a firearm to commit a felony. Id. Jacob was sentenced to life imprisonment for first-degree murder, 10 years to life for second-degree murder, and 6

---

[1] Jacob's Motion to Amend seeks to add a paragraph to the Complaint, clarifying that he is suing Patrick Condon in both his individual and official capacities. See Filing No. 10 at 2. Jacob characterizes his amendment as "supplemental" to the original Complaint. Filing No. 10 at 2.

2/3 to 20 years for each firearm charge, all to run consecutively.  *Id.*  Condon, the only named defendant, is the County Attorney for Lancaster County, Nebraska.  *Id.* at 2.

## A.  Jacob's Theories Supporting His Claim

The Complaint includes substantial background on Jacob's theories of the alleged motives of others leading to the murders.  *See Id.* at 9-26.  In brief, Jacob and Hopper began dating in May 1988.  *Id.* at 19.  Jacob ended the relationship in November 1988.  *Id.*  In July 1989, Jacob learned Hopper was dating Etherton and met both on July 4, 1989, after Jacob became worried about Hopper when she did not return Jacob's calls.  *Id.*  Jacob alleges he had regular contact with Hopper and Etherton throughout July 1989.  *Id.* at 19-20.

On July 22, 1989, Hopper moved into Etherton's residence in Lincoln, Nebraska (the "residence").  *Id.* at 21.  Several days before the murders, Hopper invited Jacob to the residence and, during the visit, Jacob helped her wash some of the windows.  *Id.*  At the end of the visit, Hopper asked Jacob to obtain Etherton's credit history.  *Id.*  Jacob considered this request the following weekend and, on August 1, 1989, Jacob went to the residence and informed Hopper that he would not do it.  *Id.*  Jacob then left the residence to go to his office before leaving on a planned vacation that afternoon.  *Id.* at 20–21. Jacob alleges he was in Minnesota in the early morning hours of August 2, 1989.  *Id.* at 24.

Jacob alleges that sometime during the evening of August 1, 1989, Hopper entered Jacob's office and stole several items, including a Llama 9mm handgun.  *Id.* at 25-26.  After returning to the residence from Jacob's office, Hopper was confronted by Etherton, who blamed Hopper and Jacob for a removed window at the residence.  *Id.* at 26.  Etherton also discovered evidence that would reveal his unethical business tactics

against Hopper's extended family's gas station business. *Id.* Because he was upset, Etherton assaulted Hopper. *Id.* at 27.

Jacob theorizes that, after the assault, Hopper took Jacob's stolen Llama 9mm handgun into Etherton's bedroom and shot Etherton. *Id.* John Ingram, who also lived in the residence, heard the shots and intervened. *Id.* at 28. Ingram struggled with Hopper over the gun and ultimately shot both Etherton and Hopper. *Id.* at 28-29. Etherton died at the residence, *id.* at 29, and Hopper was taken to the ICU, *id.* at 31, where she died several days later, *id.* at 33.

## B. Jacob's State Court Motion for DNA Testing

At the time of Jacob's trials, shell casings and bullet slugs recovered from the crime scene tested positive for blood, but the amount of blood was insufficient to identify the source. *Id.* at 2. At the time, DNA technology could not recover DNA from spent shell casings and bullet slugs. *Id.* Decades later, in 2019, Jacob learned of new methods for recovering DNA from shell casings. *See id.* at 3.

Jacob believed that DNA recovered from the residence could help prove his theory that Hopper fired the first two shots into Etherton, and that Ingram shot both Etherton and Hopper. *See id.* at 5. Bullet slugs from the crime scene were fired from a Llama 9mm, like the one Jacob owned at the time. *Id.* at 2. Jacob stored his Llama 9mm in the desk drawer of his office, and kept only four cartridges in the clip, even though the clip could hold eight cartridges. *Id.* Jacob did this because his father taught him to never store more than half the clip full of cartridges for a long time because it would weaken the clip spring. *Id.* Jacob claims that, after the murders, he discovered that his Llama 9mm had been taken. *Id.*

Jacob's theory appears to be that DNA testing could show that Hopper stole the Llama 9mm from Jacob's office. *Id.* at 5. Police recovered six spent shell casings and one unfired cartridge from the crime scene. *Id.* at 2. Thus, Jacob alleges that if DNA testing shows two shells had only Jacob's DNA, and the rest of the shells had only Hopper's DNA, then DNA testing would be favorable to Jacob's claim that Hopper took the Llama 9mm from Jacob's office, loaded more shells into the gun, and fired the first two shots at Etherton. *Id.* at 5. In sum, DNA testing may show who possessed the Llama 9mm just prior to the shooting. *Id.*

On June 18, 2019, Jacob filed a motion in Nebraska state court for DNA testing, requesting DNA testing of seven shell casings, three bullet slugs, and a gauze sample from the living room floor of the house where the murders occurred. *Id.* at 3. Jacob also requested DNA testing of a drywall bullet hole, which could reveal that Hopper's head wound occurred while she was under the bed. *Id.* at 4. In response to Jacob's motion, Defendant[2] filed an inventory of evidence items that had been properly stored for the case. *Id.* at 3. Defendant also filed a motion to deny DNA testing, which Jacob alleges misrepresented facts and several of Jacob's theories. *Id.*

The state district court denied Jacob's motion for DNA testing and granted the motion to deny DNA testing. *State v. Jacob*, 960 N.W.2d 327, 332, *opinion modified on denial of reh'g*, 964 N.W.2d 252 (Neb. 2021). The state district court did not respond to Jacob's request for DNA testing of the drywall bullet hole. Filing No. 1 at 6. Jacob was not appointed counsel and had to proceed pro se throughout the state court proceedings. *Id.* at 3. Jacob filed a motion to alter or amend after the district court's order, but the court

---

[2] Jacob uses the term "Defendant" but it is unclear whether the allegation refers to Patrick Condon. For purposes of this summary, the Court also uses the term Defendant.

denied the motion as untimely, *Id.* at 6, and concluded the motion was "abandoned" because no notice of hearing was filed with it, *Id.* at 7. Jacob appealed to the Nebraska Supreme Court, which affirmed the district court's denial of DNA testing. *Id.*

## C.  This Lawsuit

Jacob alleges that the Nebraska DNA Testing Act ("the Act"), Neb. Rev. Stat. § 29-4116 *et seq*. (Reissue 2016), as construed by Nebraska courts, violates his due process rights under the Fifth and Fourteenth Amendments in two ways. First, the Act permitted Defendant to ignore and deny a request for testing items for biological evidence. Filing No. 1 at 36. Second, the Act permitted Defendant to deny testing unless Jacob showed the results would exonerate Jacob. *Id.*

Jacob seeks appointment of counsel knowledgeable about DNA testing; a declaration of his due process right to have evidence tested; an injunction ordering the Defendant to provide evidence to appointed counsel for testing by specialized DNA labs; and an injunction ordering Defendant to pay for the testing. *Id.* at 36-37.

## II.  APPLICABLE LEGAL STANDARDS ON INITIAL REVIEW

The Court is required to review prisoner and in forma pauperis complaints seeking relief against a governmental entity or an officer or employee of a governmental entity to determine whether summary dismissal is appropriate. *See* 28 U.S.C. §§ 1915(e) and 1915A. The Court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

Pro se plaintiffs must set forth enough factual allegations to "nudge[] their claims across the line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)).  However, "[a] pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted).

### III.  DISCUSSION

Jacob brings this action pursuant to 42 U.S.C. § 1983 asserting two causes of action based on alleged violations of his rights under the Due Process clauses of the Fifth and Fourteenth Amendments of the United States Constitution.  To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the United States Constitution or created by federal statute and also must show that the alleged deprivation was caused by conduct of a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993).  Upon review, the Court finds Jacob's Complaint fails to state a plausible claim for relief and is subject to dismissal.

6

**A. Alleged Constitutional Violation**

Jacob's alleged due process violation is unclear.  For both causes of action, Jacob alleges that the Act, as interpreted by Nebraska state courts, permitted Condon to deprive Jacob of his Due Process rights.  Filing No. 1 at 36.  To the extent Jacob alleges that Condon, via the Act, deprived Jacob of a general right to have DNA evidence tested, the Supreme Court has held that there is no "freestanding and far-reaching constitutional right of access to this new type of evidence." *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 56 (2009).

Once convicted, a criminal defendant has only a "limited [liberty] interest in postconviction relief." *Osborne*, 557 U.S. at 69.  In *Skinner v. Switzer*, 562 U.S. 521, 525 (2011), the Supreme Court recognized that "*Osborne* severely limits the federal action a state prisoner may bring for DNA testing."  This is because "*Osborne* rejected the extension of substantive due process to this area, and left slim room for the prisoner to show that the governing state law denies him procedural due process." *Skinner*, 562 U.S. at 525 (internal citations omitted).  Thus, Jacob's rights to post-conviction DNA testing arise from his "limited [liberty] interest in postconviction relief" arising from the Act, *see Osborne*, 557 U.S. at 69, and not from a substantive due process right.  Thus, Jacob cannot rely solely on a general due process right to access DNA evidence for testing but must identify how the Act or Condon deprived him of any rights.  As currently pled, Jacob only states that his requests for DNA testing were denied by Nebraska state courts and that the denials mischaracterized some of his arguments.  These allegations are insufficient to support a claim for a due process violation under § 1983.

**B.** ***Rooker-Feldman* Doctrine**

Because Jacob's Complaint does not identify how the Act violated his due process rights, his claim is distinguishable from the complaint at issue in *Skinner* and is barred by the *Rooker-Feldman* doctrine.  As noted above, "[f]ederal courts may upset a State's postconviction relief procedures only if they are fundamentally inadequate to vindicate the substantive rights provided."  *Id.*  For this reason, the Supreme Court in *Osborne* emphasized state legislatures bear the primary task of balancing "DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice." *Id.* at 62.

The *Rooker-Feldman* doctrine provides that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction over challenges to state court judgments and state proceedings.  *Mosby v. Ligon*, 418 F.3d 927, 931 (8th Cir. 2005); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 476 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).  Specifically, the doctrine "bars federal courts from hearing cases brought by the losing parties in state court proceedings alleging 'injury caused by the state-court judgment and seeking review and rejection of that judgment.'" *Mosby*, 418 F.3d at 931 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005)).  Federal district courts do not have jurisdiction "over challenges to state-court decisions . . . even if those challenges allege that the state court's action was unconstitutional."  *Feldman*, 460 U.S. at 486; *see also Ballinger v. Culotta*, 322 F.3d 546, 548-49 (8th Cir. 2003) (dismissing claims under *Rooker-Feldman* doctrine where the relief requested in the complaint would effectively reverse or undermine the state court decision or void its ruling and noting that "[f]ederal district courts thus may not 'exercis[e]

8

jurisdiction over general constitutional claims that are 'inextricably intertwined' with specific claims already adjudicated in state court.'" (citation omitted)). Put simply, a federal district court does not possess authority in a civil rights case to review or alter a final judgment of a state court judicial proceeding. *See West v. Crnkovich*, No. 8:12CV273, 2013 WL 2295461, at *3 (D. Neb. May 24, 2013); *see also Keene Corp. v. Cass*, 908 F.2d 293, 297 (8th Cir. 1990) (the *Rooker-Feldman* Doctrine applies to Section 1983 actions as well as claims for injunctive and declaratory relief).

In *Skinner*, the plaintiff, like Jacob, sued his prosecutor to obtain evidence for DNA testing. 562 U.S. at 529. The plaintiff in *Skinner* challenged Texas's postconviction DNA testing statute "as construed by the Texas courts." *Id*. at 531. The Court held that, inter alia, the *Rooker-Feldman* doctrine "does not preclude a plaintiff from bringing an 'independent claim' that, though similar or even identical to issues aired in state court, was not the subject of a previous judgment by the state court." *Skinner*, 562 U.S. at 532. The Supreme Court reasoned that the plaintiff in *Skinner* did not challenge the state court's decisions and judgment denying him DNA testing under the Texas postconviction DNA statute. *Id*. at 530, 532–33. Instead, the plaintiff "challenge[d], as denying him procedural due process, Texas' postconviction DNA statute 'as construed' by the Texas courts," *id*. at 530, and asserted that the "statute was constitutionally inadequate as to *any* prisoner who failed to seek DNA testing before trial." *Cooper v. Ramos*, 704 F.3d 772, 780 (9th Cir. 2012) (emphasis in original).

By contrast, in this case, Jacob's Complaint focuses solely on the alleged errors made by the state district court and Nebraska Supreme Court when it denied his motion for testing. *See, e.g.,* Filing No. 1 at 3, 6-9, 12, 35, 36. Other than adding a request to

test some wire cutters not included in his state court motion, Jacob expressly seeks the very same DNA testing that the Nebraska state courts denied him. *See Id.* at 36. Despite Jacob's attempt to word his Cause of Action similar to the claim in *Skinner*, the Complaint contains no allegations that could be construed to challenge whether the Act itself denied Jacob due process. The Causes of Action section specifically states that the Act, "as authoritatively construed by the Nebraska Courts permitted Defendant to deny a REQUEST FOR TESTING EVIDENCE ITEMS." *Id.* at 36 (emphasis in original). Thus, rather than challenge any specific provision of the statute, Jacob expressly references the state district court and Nebraska Supreme Court's denial of Jacob's motion for testing.

As noted above, federal courts must focus on the relief requested in the complaint when determining whether *Rooker-Feldman* applies. *Ballinger*, 322 F.3d at 548-49. The relief Jacob seeks would effectively reverse or undermine the state court decision without any direct challenge to the Act itself. Accordingly, *Skinner* is distinguishable, and the *Rooker-Feldman* doctrine is a jurisdictional bar to Jacob's claims. *See, e.g., Wade v. Monroe Cnty. Dist. Att'y*, 800 Fed.Appx. 114, 118–19 (3d Cir. 2020) (applying *Rooker-Feldman* and distinguishing *Skinner* where plaintiff's constitutional challenge to state DNA statute was focused on the plaintiff's specific case and sought an order granting the DNA testing plaintiff was denied by state court); *Chapman v. Foxx*, No. 22-CV-5510, 2025 WL 306199, at *5 (N.D. Ill. Jan. 27, 2025) (distinguishing *Skinner* and applying *Rooker-Feldman* where plaintiff focused on state court errors and expressly sought the very same DNA testing the state court denied); *Herrick v. Standard*, No. 18-1191, 2023 WL 3137967, at *4–6 (C.D. Ill. Apr. 27, 2023), *appeal dismissed sub nom. Herrick v. Webb*, No. 23-1881, 2023 WL 7319523 (7th Cir. Oct. 27, 2023) (distinguishing *Skinner* and applying

*Rooker-Feldman* where plaintiff sought entry of "an order compelling defendants to give him access to the same evidence he sought for testing from the trial court, and to order Defendants to have those items tested.").

### IV. CONCLUSION

In its present form, Jacob's Complaint fails to state a claim upon which relief can be granted.  Nevertheless, on the Court's own motion, Jacob shall have 30 days from the date of this Memorandum and Order to file an amended complaint that sufficiently states his procedural-due-process claims.  The amended complaint must specify the capacity in which the Defendant and any additional defendants are sued and must set forth all of Jacob's claims (and any supporting factual allegations).  To be clear, Jacob's amended complaint must restate the relevant allegations of his Complaint, Filing No. 1, and any new allegations. Jacob should be mindful to explain the relief he is seeking and to state the constitutional and jurisdictional basis for his claim.  Jacob is warned that any amended complaint he files will supersede, not supplement, his prior pleadings.

If Jacob fails to file an amended complaint in accordance with this Memorandum and Order, this action will be dismissed without prejudice and without further notice.  The Court reserves the right to conduct further review of Jacob's claims pursuant to 28 U.S.C. §§ 1915(e) and 1915A after he addresses the matters set forth in this Memorandum and Order.

IT IS THEREFORE ORDERED:

1.    Jacob's Motion for Leave to Amend, Filing No. 10, is granted consistent with this Memorandum and Order.

2.      Jacob shall have 30 days to file an amended complaint in accordance with
this Memorandum and Order.  Failure to file an amended complaint within
the time specified by the Court will result in the court dismissing this case
without further notice to Jacob.  In his amended complaint, Jacob must state
the capacity (official, individual, or both) in which each Defendant is sued
and set forth all of Jacob's claims (and any supporting factual allegations)
against each Defendant.   Plaintiff should be mindful to explain in his
amended complaint what each Defendant did to him, when each Defendant
did it, and how each Defendant's actions harmed him.  Jacob should also
be mindful to explain the relief he is seeking and to state the constitutional
and jurisdictional basis for his claims.

3.      In the event Jacob files an amended complaint, Jacob shall restate the
allegations of the Complaint, Filing No. 1, and any new allegations.  Failure
to consolidate all claims into one document may result in the abandonment
of claims.  Jacob is warned that an amended complaint will supersede, not
supplement, his prior pleadings.

4.      The Court reserves the right to conduct further review of Jacob's claims
pursuant to 28 U.S.C. §§ 1915(e) and 1915A in the event he files an
amended complaint.

5.      The Clerk of the Court is directed to set a pro se case management deadline
using the following text: **February 27, 2026** —amended complaint due.

6.     Jacob shall keep the Court informed of his current address at all times while this case is pending.  Failure to do so may result in dismissal without further notice.

7.     Plaintiff's Motion for Status, Filing No. 11, is granted, and this Memorandum and Order shall serve as the Court's update as to the status of this case.


Dated this 28th day of January, 2026.

BY THE COURT:

Joseph F. Bataillon
Senior United States District Judge